**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SHARON HURST, | : | |
| Plaintiff, | : | Civil Action No. 12-1613 (ES) (JAD) |
| v. | : | MEMORANDUM |
| UBS WEALTH MANAGEMENT, | : | |
| Defendant. | : | |

**SALAS, DISTRICT JUDGE**

This action arises out of *pro se* Plaintiff Sharon Hurst's ("Hurst") Complaint alleging racial and color discrimination, "harassment and deliberate career sabotage ending in retaliatory termination after complaints were made to the UBS management." (D.E. No. 1, Compl. at 2). The Court has jurisdiction under 28 U.S.C. § 1331. Defendant UBS Financial Services Inc.'s[1] ("UBS") moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (D.E. No. 61). Having considered the parties' submissions in support of and in opposition to the instant motion, the Court decides the matter without oral argument. *See* Fed. R. Civ. P. 78(b). For the reasons set forth below, the Court GRANTS UBS's motion for summary judgment.

---

[1] UBS Financial Services Inc. has been improperly pleaded as UBS Wealth Management. (D.E. No. 61-2 at 1).

1

**I.  BACKGROUND**[2]

*The Parties.*  UBS is a financial services organization providing a full range of investment services to its retail and institutional clients, including advisory and brokerage services.  (SMF ¶ 1).  Hurst began working for UBS (and its predecessor Paine Webber, Inc.) in 1988, as a Senior Cashier Clerk in the Cashier Bond Allocation Department.  (*Id.* ¶ 2).

Hurst was laid off on October 20, 2009, as part of a reduction in force ("RIF") that affected 156 employees.  (*Id.* ¶ 3).  At the time of her termination, Hurst was a Lead Associate in the Data Resources Management Group at UBS ("DRM Group"), a position she had held since March 2005. (*Id.* ¶ 4).  At all relevant times, Hurst worked in the DRM Group as part of the team responsible for low-priority "Back Office" technical support functions.  (*Id.* ¶ 13).  As a member of the Back Office function, Hurst was responsible for "Tier III" applications.  (*Id.* ¶ 21).  Moreover, the Back Office team supported Oracle and Sybase systems, though Hurst worked primarily on Sybase projects.  (*Id.* ¶ 23).

*Supervisor Timeline.*  In May 2004, Hurst reported to James Keegan, who reported to Neil Goodheart.  (*Id.* ¶ 14).  Goodheart, in turn, reported to J.P. Viegas, the Director of the DRM Group. (*Id.*).  At that time, Goodheart was responsible for the team's handling of Platform, Client Facing, and Back Office functions.  (*Id.* ¶ 15).

In 2005, the DRM Group was restructured and members of the Back Office function (including Hurst) were instead supervised by Rajenda Pande, who reported directly to Viegas (and

---

[2]  The Court distills these facts from Defendant's Statement of Undisputed Material Facts Pursuant to Fed. R. Civ. P. 56 and Local Civ. R. 56.1 (D.E. No. 61-2 ("SMF")) and exhibits accompanying the parties' submissions. Unless otherwise noted, these background facts are undisputed.  *See* L. Civ. R. 56.1 (providing that "any material fact not disputed shall be deemed undisputed for the purposes of the summary judgment"); *Ruth v. Selective Ins. Co. of Am.*, No. 15-2616, 2017 WL 592146, at *3 (D.N.J. Feb. 14, 2017) ("[A] movant who files a proper Local Civil Rule 56.1 statement of undisputed material facts . . . receives the benefit of the assumption that such facts are admitted for purposes of the summary judgment motion.").

subsequently to Earl Barnes). (*Id.* ¶ 16). At that time, Goodheart became responsible for the Database Infrastructure function, a highly technical position where he had no direct reports. (*Id.* ¶ 17). Since 2005, Goodheart did not supervise or have any managerial responsibility for Hurst, nor did he have any input into her performance reviews or in the termination decision. (*Id.* ¶ 18). Rather, beginning in 2005, in his Database Infrastructure function, Goodheart coordinated the employee training schedule with the allocated budget, but the managers of each team nominated candidates for the training classes. (*Id.* ¶ 19). Goodheart did not make any decisions about who received what training. (*Id.*).

In 2008, Shabeer Meccai replaced Pande as Hurst's immediate supervisor, but the organizational structure remained the same through the end of Hurst's employment with the firm. (*Id.* ¶ 20).

*Hurst's Performance.* DRM Group employees each receive a year-end evaluation (the "PMM") from their managers, which assesses their prior year's performance and identifies critical development areas to build in the coming year. (*Id.* ¶ 24). Two of Hurst's managers—Pande in 2007 and Meccai in 2008—rated Hurst in PMM as a 3C, and Hurst agreed with the managers' assessment of her performance. (*Id.* ¶¶ 25-26). During Hurst's employment, UBS management also segmented employees based on their performance and their contribution relative to peers. (*Id.* ¶ 36). Performance segmentation is distinguishable from PMM, which is an absolute measure of performance as compared to the individual's contribution and competency. (*Id.*). The segmentation consisted of a mandatory distribution of four segments: "1 – Outstanding (10%), 2 – Superior (20%), 3 – Solid (60%) and 4 – Bottom Contributors (10%)." (SMF ¶ 36). Barnes (who replaced Viegas and began supervising Hurst in 2005) had segmented Hurst as a 4. (*Id.* ¶¶ 33, 38).

***Hurst's Termination.*** In October 2009, as part of a RIF of the IT Group across the United States that resulted in 156 employees being laid off, Barnes was required to reduce the headcount in the DRM Group by four. (*Id.* ¶¶ 22, 33). Barnes selected employees for reduction based on performance segmentation within the Back Office team of the DRM Group, his judgment on the relative technical skills of each employee, and the needs of the business. (*Id.* ¶ 35). Barnes concluded that the Tier III applications were "less critical" to UBS than Tier I and II applications performed by other members of the DRM Group. (*Id.* ¶ 22). So, Barnes focused the reduction on the Back Office team in part because the Tier III support functions the team provided were less critical than other segments of the DRM Group. (*Id.* ¶ 34).

Barnes (also African American) selected for termination three individuals from the Back Office team—Hurst, an Asian male, and a white male—all segmented as 4s (i.e., Bottom Contributors, the lowest 10% relative to their peers). (*Id.* ¶¶ 33, 36-38). Barnes also selected an employee from the Platform/Client Facing team, a white male segmented as a 3 (i.e., Solid). (*Id.* ¶¶ 36-38).

Barnes considered Hurst's segmentation rating and selected Hurst for termination because she did not perform significant roles in areas such as "GEAR, SAP, Charles River, ITI, ISD, and DR failure," which were going to be the key platforms going forward. (*Id.* ¶ 39). Additionally, Barnes concluded that the redistribution of Hurst's work (which was primarily Sybase oriented) would have a lesser impact on the Back Office team, as there were plans to retire the Sybase application in the future. (*Id.*).

***Hurst's Allegations.*** On June 24, 2010, following her termination, Hurst completed an "Intake Questionnaire" at the Equal Employment Opportunity Commission ("EEOC") and

4

thereafter filed a Charge of Discrimination with the EEOC on September 15, 2010. (*Id.* ¶ 5). Hurst received her Notice of Right to Sue letter from the EEOC on December 20, 2011. (*Id.* ¶ 6).

Hurst initiated the instant action on March 8, 2012. (*See* Compl.). In her Complaint, Hurst alleges that UBS discriminated against her because of her race and unlawfully retaliated against her, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (*Id.* at 1, 3). Hurst's allegations in her Complaint are premised on the alleged discriminatory and retaliatory conduct of her prior supervisor (Goodheart), who supervised Hurst until 2005 and who Hurst claims is the only one who harassed her. (*See id.*; SMF ¶ 9).

Hurst alleges that she complained to Goodheart's supervisor in 2003 about her excessive workload, and the situation was thereafter corrected. (D.E. No. 1-3 at 5; SMF ¶ 10). Hurst also alleges that she was denied opportunities to receive training on Oracle prior to 2005, but was subsequently approved for various Oracle training classes and attended those classes between 2004 and 2009. (D.E. No. 1-3 at 3-5; SMF ¶ 11). Hurst further alleges that she was initially denied premium pay, but was paid after UBS discovered the issue and Hurst submitted the requisite documentation. (D.E. No. 1-3 at 5-6; SMF ¶ 12).

Hurst did not mention discrimination or race to any manager at any time during her employment. (SMF ¶ 31). When asked whether she made any complaints of discrimination to any manager prior to her layoff, Hurst responded: "I don't believe I did, no. Not to them." (*Id.*). Hurst also asserted at her deposition that UBS was experiencing "major financial issues" and budget cuts. (*Id.* ¶ 30).

*UBS's Motion.* Following the conclusion of discovery, UBS moved for summary judgment. (D.E. No. 61-1 ("Def. Mov. Br.")). Hurst submitted a letter in response to UBS's

5

motion. (D.E. No. 65 ("Pl. Opp. Ltr.")).[3] And UBS submitted a reply in further support of its motion. (D.E. No. 66 ("Def. Reply Br.")). This matter is now ripe for resolution.

## II. STANDARDS OF REVIEW

Summary judgment is appropriate if the moving party shows that there is "no genuine issue of any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[4] A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The burden is on the moving party to show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the movant meets this burden, the non-movant must then set forth specific facts that demonstrate the existence of a genuine issue for trial. *Id.* at 324; *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).

Conversely, where the moving party bears the burden of proof at trial, it "must show that it has produced enough evidence to support the findings of fact necessary to win." *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 237 (3d Cir. 2007). "Put another way, it is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *Id.* at 238.

---

[3] The Court will treat Hurst's letter as her opposition to UBS's motion and will construe the letter and Complaint liberally in light of Hurst's *pro se* status. *See Cuevas v. Wells Fargo Bank, N.A.*, 643 F. App'x 124, 125 (3d Cir. 2016) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

[4] Unless otherwise indicated, all internal citations and quotation marks are omitted, and all emphasis is added.

6

Notably, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. But the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Swain v. City of Vineland*, 457 F. App'x 107, 109 (3d Cir. 2012) (stating that the non-moving party must support its claim "by more than a mere scintilla of evidence").

## III. DISCUSSION

### A. Title VII Discrimination Claim

***Legal Standard.*** "Title VII prohibits employers from discriminating on the basis of race, color, religion, sex, or national origin." *Slagle v. Cty. of Clarion*, 435 F.3d 262, 265 (3d Cir. 2006) (citing 42 U.S.C. § 2000e-2). To establish a *prima facie* case of unlawful employment discrimination in a Title VII action involving a RIF, "the plaintiff must show that (1) she belonged to a protected class, (2) she was qualified for the position from which she was terminated, (3) she was terminated and (4) persons outside of the protected class were retained." *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 294-95 (3d Cir. 1997). "Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the plaintiff's termination." *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). "If the defendant articulates such a reason, the plaintiff then must prove that the facially legitimate reason was a pretext for a discriminatory motive." *Id.* (citing *Burdine*, 450 U.S. at 252-53).

***Analysis.*** Even assuming that Hurst established a *prima facie* case of unlawful employment discrimination, the Court finds that Hurst's discrimination claim nevertheless fails as a matter of law because Hurst has not pointed to any evidence to suggest that UBS's legitimate,

nondiscriminatory reason for the RIF was pretextual. Hurst, therefore, has failed to set out any specific fact showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2) (requiring the nonmoving party to "set out specific facts showing a genuine issue for trial").

UBS has advanced that Hurst was laid off in 2009 as part of a RIF that impacted 156 employees. (Def. Mov. Br. at 1). Hurst's supervisor, Barnes "(also African American)[,] focused his headcount reduction on the DRM Back Office because, he concluded its functions were less critical than other areas under his management." (*Id.*). "Hurst and the other two employees selected for termination from the DRM Back Office team—an Asian male and a Caucasian male—had the lowest segmentation ratings on the team; all three were rated 'Bottom Contributors.'" (*Id.* at 1-2). "Mr. Barnes also determined that Plaintiff's peers had more valuable technical expertise than Plaintiff, as Plaintiff was skilled in Sybase and UBS[] was in the process of phasing out the Sybase platform." (*Id.* at 2).

The Court finds that UBS's stated reasons, "which need only to be articulated, and need not be proven at this stage, to be legitimate." *Marione v. Metro. Life Ins. Co.*, 188 F. App'x 141, 144 (3d Cir. 2006) (finding legitimate a RIF where "employees were selected for termination based on a consensus assessment of their contributions to [a specific department] within the past year and their abilities to perform emerging technologies" and "recogniz[ing] that in a RIF, . . . [even] an adequate employee who is under-performing relative to his peers may still be chosen for termination"); *see also Burdine*, 450 U.S. at 254-55 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons . . . . The explanation provided must be legally sufficient to justify a judgment for the defendant.").

"After a defendant has stated legitimate, nondiscriminatory reasons for its actions, plaintiff must then be afforded a fair opportunity to show that defendant's reasons are in fact pretextual."

8

*Marione*, 188 F. App'x at 144. The standard for evaluating whether a plaintiff has met his burden to demonstrate pretext at the summary judgment stage is well-established:

> to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 761-64 (3d Cir. 1994)). Therefore, the relevant question for this Court is whether Hurst has offered any evidence from which a fact finder could reasonably disbelieve UBS's stated reasons for terminating Hurst or find that UBS was more likely than not motivated by discrimination. *Id.*

Hurst has not proffered any evidence challenging UBS's proffered reasons for the RIF. In opposition to UBS's motion, Hurst argues that "UBS has cleverly used the typical 'reduction in workforce' tactic that any firm can easily use - to retaliate against me (an employee who's always ranked 1-3), yet UBS is trying to claim I was one of their 'bottom performers' who are noted by a rank of 4-5." (Pl. Opp. Ltr. at 1). But, as the Third Circuit held in *Marione*, these arguments miss the mark. *See* 188 F. App'x at 145 (holding that plaintiff's criticisms of employer's "performance evaluation methods" and disagreement with employer's "assessment of his potential in comparison to others . . . miss the mark"). "To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Id.*[5] Plaintiff's arguments in opposition—comprising

---

[5] *See also Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir. 1997) ("The question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination."); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1216 (3d Cir. 1988) ("Our inquiry . . . is not an independent assessment of

9

general theories, speculation, and allegations of discrimination—are insufficient to survive summary judgment. *Fairclough v. Wawa, Inc.*, 412 F. App'x 465, 470 (3d Cir. 2010) ("[S]peculation is an insufficient substitute for evidence from which a reasonable juror could infer discriminatory intent."); *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment.").

Although the Court sympathizes with Hurst's situation, nothing in this record leads the Court to believe that UBS's actions or underlying motivations were based on improper considerations. According, the Court grants UBS's motion as to Hurst's discrimination claim.

### B. Title VII Retaliation Claim

***Legal Standard.*** "To establish a prima facie claim of unlawful retaliation under Title VII, a plaintiff must show that (1) she engaged in activity protected by Title VII, (2) her employer took an adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action." *Jackson v. Temple Univ. Hosp., Inc.*, 501 F. App'x 120, 123 (3d Cir. 2012). The anti-retaliation provision of Title VII provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

***Analysis.*** Hurst alleges in her Complaint that she "was laid off . . . in retaliation for speaking out on racial discrimination the firm allowed one of their managers (Neil Goodheart who is Caucasian) to carry out for several years." (D.E. No. 1-3 at 2). But the undisputed evidence

---

how we might evaluate and treat a loyal employee."); *Logue v. Int'l Rehab. Assocs., Inc.*, 837 F.2d 150, 155 n. 5 (3d Cir. 1988) ("[O]ur task is not to assess the overall fairness of . . . [the] employer's actions.").

from Hurst's deposition testimony reveals that Hurst did not mention discrimination or race to any manager at any time during her employment with UBS. (SMF ¶ 31). When asked whether she made any complaints of discrimination to any manager prior to her layoff, Plaintiff responded: "I don't believe I did, no. Not to them." (*Id.*). In the Third Circuit, "[a]ll that is required is that plaintiff allege . . . that his or her employer violated Title VII by discriminating against him or her on the basis of race, color, religion, sex, or national origin, in any manner." *Slagle*, 435 F.3d at 268. Because Hurst did not do so, she cannot assert a claim for retaliation. *See id.* at 267 (refusing to "dispense with the requirement that the plaintiff allege prohibited grounds").

Hurst further alleges that, in the course of her employment, she also complained of excessive workload, denial of training, and lack of premium pay. (*See* D.E. No. 1-3 at 2-3; 5). The Third Circuit, however, has declined to "dispense with the requirement that the plaintiff allege prohibited grounds." *Slagle*, 435 F.3d at 267. Because these complaints do not allege prohibited grounds (namely, discrimination on the basis of race, color, religion, sex, or national origin), Hurst again cannot assert a claim for retaliation.

Accordingly, the Court grants UBS's motion as to Hurst's retaliation claim.

## IV.    CONCLUSION

For these reasons, the Court GRANTS UBS's motion for summary judgment. An appropriate Order accompanies this Memorandum.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**